IN THE UNITED STATES COURT OF APPEALS

FOR THE EIGHTH CIRCUIT

_____

**TODD KARLEN,**
*Plaintiff-Appellee,*
vs.
**JONES LANG LASALLE AMERICAS, INC.**
*Defendant-Appellant.*
_____

On Appeal from the
United States District Court for the District of Minnesota
Case No. 0:12-cv-01102 (JNE/JJG)
_____

**BRIEF OF DEFENDANT-APPELLANT
JONES LANG LASALLE AMERICAS, INC.**
_____

Hal A. Shillingstad, #195777
Jaime N. Cole, #0390677
Wells Fargo Center
90 South Seventh Street, Suite 3800
Minneapolis, MN  55402
Telephone:  612.339.1818
Fax:  612.339.0061
Email:  hal.shillingstad@ogletreedeakins.com
        jaime.cole@ogletreedeakins.com

*Attorneys for Defendant – Appellant*

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

This is a commissions case involving the Appellee ("Karlen"), a Leasing Specialist, who was terminated for performance and who ultimately, upon agreement of the parties and industry standard, received payment for commissions he earned after his termination by Appellant ("JLLA"). To determine whether JLLA had a legal obligation to pay Karlen, the District Court had to examine compensation agreements involved, as well as JLLA's earning and pay practices. Determining no compensation had been earned for all of Karlen's compensation claims, save one, the District Court granted summary judgment for JLLA. Overlooking JLLA's practices for determining *when* a commission is earned, the District Court denied JLLA's summary judgment on Karlen's claim for commissions related to the Primebar deal, a deal that closed and was earned ***after*** his termination from employment.

JLLA requests this Court reverse the District Court's decision and hold that JLLA did not violate Minn. Stat. §§ 181.03 and 181.13 because the commissions were not earned and unpaid at the time of Karlen's termination, or in the alternative, were not improperly conditioned payments. To affirm the District Court's decision, this Court would have to adopt the District Court's summary conclusion that the commissions were earned, ignoring Minn. Stat. §§ 181.03 and 181.13. JLLA requests a 15 minute oral argument.

Appellate Case: 13-2379     Page: 2     Date Filed: 08/21/2013 Entry ID: 4067066

## RULE 26.1 CORPORATE DISCLOSURE

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Defendant Jones Lang LaSalle Americas, Inc. provides the following information as its Corporate Disclosure Statement.  Jones Lang LaSalle Americas, Inc. is a wholly-owned subsidiary of Jones Lang LaSalle Incorporated, a publicly held corporation.  There is no other publically held corporation that owns 10% or more of the stock of Jones Lang LaSalle Incorporated.

Appellate Case: 13-2379     Page: 3     Date Filed: 08/21/2013 Entry ID: 4067066

# TABLE OF CONTENTS

SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT .......... ii

RULE 26.1 CORPORATE DISCLOSURE........................................................... iii

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF THE ISSUES........................................................2

STATEMENT OF THE CASE........................................................3

STATEMENT OF THE FACTS ........................................................4

    I.  Karlen's Employment and Poor Performance with JLLA .....................4

    II.  Karlen's Compensation Structure at JLLA.........................................6

    III. Karlen's Terminaion From Employment and The Primebar Deal ..............8

SUMMARY OF THE ARGUMENT......................................................11

LEGAL ARGUMENT........................................................13

    I.  Standard and Scope of Review........................................................13

    II.  The District Court Erred in Holding That JLLA Violated Minn. Stat. § 181.03 and §181.13 Because the Primebar Commissions at Issue Were Not "Earned" and "Unpaid" at the Time of Karlen's Discharge..............14

        A.  In accordance with the Comp Change Memo, Karlen did not earn commission related to the Primebar deal prior to his termination from employment; thus, there is not statutory violation.................16

        B.  The commission generating event, as defined by JLLA's practices, occurred after his termination from employment; thus, there is no statutory violation....................................................18

        C.  JLLA's subsequent agreement to pay the Primebar commissions negates any possibility of a statutory violation........................20

Appellate Case: 13-2379    Page: 4    Date Filed: 08/21/2013 Entry ID: 4067066

III. Any Alleged "Conditioned" Payments were Inconsequential When It Comes To Determining Whether There Was a Statutory Violation..........21

CONCLUSION ........................................................................................23

Appellate Case: 13-2379    Page: 5    Date Filed: 08/21/2013 Entry ID: 4067066

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ......................................................................14

*Bechtold v. City of Rosemount*,
104 F.3d 1062 (8th Cir. 1997)........................................................22

*Buysee v. Pain, Webber, Jackson & Curtis, Inc.*,
623 F.2d 1244 (8th Cir. 1980)........................................................23

*Fiebelkorn v. IKON Office Solutions*,
668 F. Supp. 2d 1178 (D. Minn. 2009) ................................. 2, 15, 20

*Friedenfeld v. Winthrop Resources Corp.*,
No. C5-02-1606, C4-02-1659,
2003 WL 1908112 (Minn. Ct. App. Apr. 22, 2003) ................ 2, 16, 19

*Holman v. CPT Corp.*,
457 N.W.2d 740 (Minn. App. 1990)
*review denied* (Sept. 20, 1990) ......................................................15

*Hot Stuff Foods, LLC v. Dornbach*,
726 F. Supp. 2d 1038 (D. Minn. 2010) ..........................................17

*Lapadat v. Clapp Thomseen Co.*,
397 N.W.2d 606 (Minn. Ct. App. 1986) ..........................................17

*Lee v. Fresenius Medical Care, Inc.*,
741 N.W.2d 117 (Minn. 2007) ....................................................2, 15

*Torgerson v. City of Rochester*,
643 F.3d 1031 (8th Cir. 2011) ........................................................13

*Wiser v. Wayne Farms*,
411 F.3d 923 (8th Cir. 2005) ..........................................................14

Appellate Case: 13-2379     Page: 6     Date Filed: 08/21/2013 Entry ID: 4067066

## Statutes

Minn. Stat. § 181.03 ..................................................................... 13, 15, 18, 21, 23

Minn. Stat. § 181.13 ......................................................................... 13, 15, 18

## Rules

Fed. R. Civ. P. 56(c) ...................................................................... 14

Fed.R.Civ.P. 8(c) ......................................................................... 22

Appellate Case: 13-2379    Page: 7    Date Filed: 08/21/2013 Entry ID: 4067066

# JURISDICTIONAL STATEMENT

The United States District Court for the District of Minnesota had diversity jurisdiction under 28 U.S.C § 1332 because Karlen was a citizen of Minnesota and JLLA is a Maryland corporation with its principal place of business in Illinois. Additionally, Karlen's claimed damages were in excess of $120,000, which exceeds the jurisdictional amount of $75,000 set forth in 28 U.S.C. § 1332(a) . The District Court granted in part and denied in part JLLA's Motion for Summary Judgment on May 23, 2013. Final judgment was entered on May 24, 2013. JLLA filed this appeal on June 24, 2013. The Eighth Circuit Court of Appeals has jurisdiction to hear this appeal of the District Court's final judgment pursuant to 28 U.S.C. § 1291.

Appellate Case: 13-2379    Page: 8    Date Filed: 08/21/2013 Entry ID: 4067066

# STATEMENT OF THE ISSUES

1.      The District Court denied JLLA's motion for summary judgment on Karlen's statutory claims and instead held that JLLA violated Minn. Stat. §§ 181.03 and 181.13 because it improperly conditioned payments relating to commission payments from the first-floor space leased out in the Primebar deal. <u>ISSUE 1</u>: Did the District Court err in holding that Defendant-Appellant JLLA violated Minn. Stat. §§ 181.03 and 181.13 and breached its contract in connection with commissions related to Primebar's lease of the first floor space following Plaintiff-Appellee's termination? <u>ANSWER TO ISSUE 1</u>: The District Court did err in denying summary judgment and ruling that JLLA violated Minn. Stat. §§ 181.03 and 181.13 because the commissions at issue were not earned and unpaid at the time of Karlen's termination and they were not conditioned payments in violation of the statutes.

<u>Apposite Cases</u>:

- *Fiebelkorn v. IKON Office Solutions*, 668 F. Supp. 2d 1178 (D. Minn. 2009).

- *Friedenfeld v. Winthrop Resources Corp.*, No. C5-02-1606, C4-02-1659, 2003 WL 1908112 (Minn. Ct. App. Apr. 22, 2003).

- *Lee v. Fresenius Medical Care, Inc.,* 741 N.W.2d 117 (Minn. 2007).

Appellate Case: 13-2379     Page: 9     Date Filed: 08/21/2013 Entry ID: 4067066

# STATEMENT OF THE CASE

On April 9, 2012, Karlen filed this lawsuit in state court alleging the following claims: failure to pay wages in violation of Minn. Stat. § 181.03 and § 181.13; unjust enrichment; breach of contract; and promissory estoppel. [Dkt # 1].[1] JLLA removed the action to the District Court of Minnesota on May 4, 2012 and subsequently filed its Answer. [Dkt # 4]. The parties engaged in discovery.

On February 28, 2013, JLLA filed a motion for summary judgment. [Dkt. ##17-23, 30]. Karlen opposed JLLA's motion. [Dkt. ##27-29]. The parties argued the motion on May 23, 2013, at which time presiding District Court Judge Joan Ericksen ruled from the bench. By a one-and-a-half-page Order dated May 23, 2013, the District Court granted in part and denied in part JLLA's Motion for Summary Judgment and dismissed all of Karlen's claims in his Complaint (six other claims) save one – Karlen's statutory (Minn. Stat. §181.03 and § 181.13) and breach of contract claim related only to revenues flowing from commissions generated by the first-floor space of the Primebar deal. [Dkt. #32] [Add. 1-2][2]. The Court entered Final Judgment the day following the hearing on May 24, 2013. [Dkt. #33] [Add. 3]. JLLA attempted to supplement the record the same day judgment was entered, but the District Court Judge denied the request. [Dkt. ##34-36].

---

[1] JLLA cites to District Court filings by their District Court docket number.
[2] JLLA cites to the Addendum as [Add.  ].

Appellate Case: 13-2379    Page: 10    Date Filed: 08/21/2013 Entry ID: 4067066

Karlen's counsel then filed her Motion for Fees, which JLLA opposed. [Dkt. ##37-43, 49-50] [Appel. J149-60].[3] On July 17, 2013, in a seven-page Order, the District Court granted in part and denied in part Karlen's Motion for Fees and Costs, substantially discounting the requested amount of fees from $48,548.31 to $20,000. [Dkt. #51] [Appel. J166]. Karlen appealed that Order on August 16, 2013. [Dkt. ##59-60].

This appeal follows. [Dkt. #41]. JLLA only appeals the Court's ruling regarding the statutory violations and breach of contract concerning the revenue related to the first-floor space of the Primebar deal.

## STATEMENT OF THE FACTS

## I.    KARLEN'S EMPLOYMENT AND POOR PERFORMANCE WITH JLLA.

Karlen started with JLLA as a Leasing Specialist in or around May 2010 for the Retail Division of JLLA in Minneapolis. [Appel. J29-30].There are multiple specialties within the Retail Division and Karlen worked for the leasing specialty within the Retail Division. [Appel. J84]. Karlen reported to Kimli Cross, Regional Manager of Leasing for the Retail Division. [Appel. J30, J84]. Cross resides and operates out of Florida and managed Leasing Specialists throughout the country. Cross reports to John Bemis, Director of Leasing for the Retail Division. Cross

---

[3] Citations to Appellant JLLA's Appendix are designated as "[Appel. __]."

Appellate Case: 13-2379    Page: 11    Date Filed: 08/21/2013 Entry ID: 4067066

also works with Steve Yenser, the Director of Markets. Greg Maloney is the President and CEO of the Retail Division. [Appel. J84].

Karlen's job was to acquire leases from local and national tenants for properties, specifically for Calhoun Square and for a shopping center in St. Louis, Missouri. Karlen's responsibilities included, but were not limited to: contacting potential tenants via telephone; canvassing other shopping centers for potential tenants; working on letters of intent; and managing the lease process between the tenant and the property owner. [Appel. J30]. BlackRock is the property owner at Calhoun Square – Karlen's primary property. [*Id*.].

During Karlen's one-and-a-half year tenure at JLLA, he had various job performance deficiencies. [Appel. J31, J55-57]. Accordingly, Karlen's poor performance resulted in a performance counseling in July 2011 – six months before he would ultimately be terminated from employment. [*Id*.]. Based upon his continued performance deficiencies, Cross issued another performance counseling in January 2012. [Appel. J31, J38, J59-63, J94]. Neither of which are in dispute.

Karlen's performance rating scores for 2010 and 2011 also substantiate his mediocre performance. For 2010, Karlen received a 3.0, a number in which less than 3.0 "generally requires somebody going on a performance plan." [Appel. J39, J68-75, J97, J99-100 ]. The following year, 2011, Karlen would have received a 2.1 had he remained employed. [*Id*.]. Anything less than a 2.5 "is dangerously

5

close to dismissal if not going to be dismissed." [*Id*.]. Karlen was terminated on January 31, 2012. [*Id*.]. John Bemis, Director of Leasing for the Retail Division, terminated Karlen's employment based on his performance. [Appel. J33-34].

## II.  KARLEN'S COMPENSATION STRUCTURE AT JLLA.

When JLLA hired Karlen in May 2010, he received a Comp Agreement regarding his compensation and other employment related items. [Appel. J36-37, J45-49].  The Comp Agreement clearly defined the bonus structure for Karlen. [*Id*.]. During 2010 and 2011, JLLA paid Karlen in accordance with the Comp Agreement. [Appel. J34, J99-100, J129, J138-39].

And in January 2012, JLLA changed its compensation structure for Leasing Specialists and went from a bonus based structure to a commission based structure. On January 17, 2012, John Bemis, Director of Leasing for the Retail Division, led a call for all Leasing Specialists to explain the compensation change. [Appel. J32]. Karlen admittedly got on the call late, but did talk with other Leasing Specialists who were on the call about the new change. [*Id*.]. Karlen understood that salaries would be lowered and commissions would take the place of bonuses. [*Id*.]. Karlen also understood that he would be eligible for a thirty percent commission on any revenue JLLA *received* for a deal he brought in. [*Id*.].

On January 23, 2012, Cross called Karlen directly to discuss the compensation change. [Appel. J32-33]. Cross confirmed what Karlen learned from

6

the conference call with Bemis – that he would be eligible for "30 percent of the commission that goes to Jones Lang LaSalle." [Appel. J33]. During this call, Cross informed Karlen that the 2011 bonuses would be paid under the terms of Comp Agreement, which specifically outlined the objective and subjective factors considered for bonuses. [Appel. J33, J88]. Ultimately, Karlen did not receive a 2011 bonus because he did not earn it prior to his termination. [4] [Appel. J129, J138-39].

On January 27, 2012, Greg Maloney, President and CEO of the Retail Division, sent a Comp Change Memo to Karlen regarding the compensation change. [Appel. J32, J38, J65]. Specifically, the Comp Change Memo provided:

- Annual base salary will be reduced from $75,000 to $60,000 effective January 21, 2012.

- During the period from 1/21/2012 – 7/6/2012, you will receive a recourse draw of $576.92 per pay period.

- Effective 1/1/2012, you will be *eligible* for a production based incentive which includes ***commission payments of up to 30% of the leasing revenue you directly earn***. Commission payment amounts are dependent upon the type of lease (small shop vs. big box) and leasing agents involved in executing the deal. You are eligible for a 10% commission payment on the deals completed in your assigned property by other employees (Regional Leasing Manager, General Manager, and Big Box leasing agent).

---

[4] The District Court granted summary judgment for JLLA on Karlen's claims related to his 2011 bonus. [Appel. J138-39]. Consequently, JLLA provides only summary evidence here related to that compensation structure. Detailed briefing on the 2011 bonus claim is contained in the parties' summary judgment memorandums. [Dkt. ##17-29].

Appellate Case: 13-2379    Page: 14    Date Filed: 08/21/2013 Entry ID: 4067066

- You will be *eligible* to receive commission payments beginning in April, *subject to your recourse draw* being completely repaid.

- Beginning in 2012, you will not be eligible for a target bonus. You will receive *any approved bonus payment for the 2011* calendar year.

[Appel. J65]. Leasing Specialists are eligible for up to thirty percent of the leasing revenue – money JLLA receives. [Appel. J32, J65, J126]. Again, Karlen admittedly understood that "if JLL *received* $100,000, [he] would receive $30,000 of that." [Appel. J32].

Upon implementing the new compensation structure, JLLA established a practice regarding how the thirty percent commission would be earned and paid to Leasing Specialists. For new leases, Leasing Specialists would earn and receive half of their thirty percent commission upon execution of the lease and after JLLA had received payment from the property owner. [Appel. J89-90, J96, J118-20]. Leasing Specialists would then earn and receive the second half of their thirty percent commission upon tenant opening and after JLLA had received payment from the property owner. [*Id.*]. No commissions are earned and/or paid to Leasing Specialists unless and until all of these conditions precedent are met. [*Id*.]. This practice remains undisputed.

## III. KARLEN'S TERMINATION FROM EMPLOYMENT AND THE PRIMEBAR DEAL.

When Karlen was terminated from employment on January 31, 2012 for performance reasons, he asked Bemis whether he would receive the commission

8

for the Primebar deal, a deal that was not signed and completed at the time of his termination but was expected to be completed shortly. [Appel. J34]. Bemis told Karlen he would look into it. [*Id.*]. Following Karlen's termination from employment, he had a few telephone calls with management to discuss his compensation and on February 15, 2012, Karlen spoke with Debbie Arendsen from Human Resources and Steve Yenser, Director of Markets, regarding his compensation. [Appel. J34-35]. They discussed a protection list,[5] the Primebar lease, and the 2011 bonus. [*Id.*]. Yenser verbally informed Karlen that JLLA would pay him for the Primebar lease and any other commissions for which Karlen was the lead agent on. [*Id.*]. Neither Karlen nor Yenser set a protection list expiration date, while on the phone call. [*Id.*]. Yenser also informed Karlen that he would not receive the 2011 bonus because receipt was "contingent upon [Karlen] being at Jones Lang LaSalle, and [he] had been terminated before the bonus had been paid." [Appel. J35].

On February 20, 2012, Karlen sent a protection list to Arendsen and Yenser, which listed all of the leases he expected to receive commissions on. [Appel. J42-43, J82]. Specifically, Karlen demanded:

---

[5] In the leasing industry, it is common practice for the parties to set up a protection list (a specific list of deals that the person worked on, which were completed or near completion at the time of separation) with a protection period (*i.e.*, 90 days or 180 days from date of separation). [Appel. J110-11].

Appellate Case: 13-2379    Page: 16    Date Filed: 08/21/2013 Entry ID: 4067066

> I **expect** to receive commissions on **leases closed in the next 90 days** with Akira, Fabrizzio Ciccone/Aura/Upstairs, Korey Bannerman, After Midnight Group, Chris DeGeare, Brian Asmus, J. Crew, lululemon, Concepts America, Paul Mitchell, Running Room, Pacifier, Kaja & Zoe Foat, Diesel, and Billabong.

[Appel. J42, J82]. None of the leases on Karlen's protection list closed within the next 90 days of his email.[6] [*Id*.].

JLLA paid Karlen his thirty percent commission on revenue received by JLLA for the Primebar deal because of the parties' agreement made subsequent to his separation from employment and according to industry standard. [Appel. J40-41, J92, J96]. When JLLA paid Karlen for the Primebar deal, it issued three separate checks, which Karlen received at his residence unaccompanied by any explanation or letter from JLLA. [Appel. J41, J112-13]. The checks were issued on May 5, June 1, and October 5 of 2012. Once Karlen involved an attorney, JLLA's legal department dealt with the issuance of the checks. Consequently, the first check was issued earlier than is practice (and earlier than it was technically earned under JLLA's practice) – prior to JLLA receiving payment from the property owner. [Appel. J92, J96, J104-09]. The following checks were issued in accordance with JLLA's practice. [*Id*.].

---

[6] The District Court also granted summary judgment for JLLA on Karlen's claims related to the H&M commission, a deal which was not on his protection list and which was signed after the suggested protection period. [Appel. J82, J138-39]; *see generally* [Dkt. ##17-29].

Appellate Case: 13-2379    Page: 17    Date Filed: 08/21/2013 Entry ID: 4067066

Karlen did not cash the checks because at the time he believed JLLA should have paid him commission on additional space that JLLA never billed or received commissions on for the Primebar deal and at the advice of counsel.[7] [Appel. J41, J112-13 ]. Karlen admittedly understood that the new commission structure meant he would be eligible for thirty percent of any revenue ***received*** by JLLA – not that JLLA could have or should have billed out. [Appel. J32]. Karlen does not dispute that JLLA paid him the correct amount for the Primebar deal minus the unaccounted for basement space. [Appel. J57-62]. Karlen also does not dispute that there is no evidence that JLLA terminated his employment with the intention of not paying him compensation. [Appel. J45].

## SUMMARY OF THE ARGUMENT

Karlen brought a lawsuit against JLLA alleging nonpayment of commissions and bonuses, as well as nonpayment of business expenses, which he asserted under Minnesota Statutes § 181.03 and § 181.13, and breach of contract, unjust enrichment, and promissory estoppel theories. Karlen waived his unjust enrichment and promissory estoppel claims by failing to oppose them on summary judgment.

---

[7] Subsequent to the commencement of this litigation and Karlen's receipt of the commission checks related to the first-floor space of the Primebar deal, Karlen's counsel inquired of JLLA's counsel about the "intentions" of those checks to which JLLA's counsel responded that "the cashing of the checks only waives your client's entitlement to any more monies out of the commission payments made by the client to JLL." [Appel. J110-11, J120]. JLLA asserted its waiver defense, as was stated in its Answer, and essentially informed Karlen's counsel that he could not double recover. [*Id*.].

Appellate Case: 13-2379    Page: 18    Date Filed: 08/21/2013 Entry ID: 4067066

The District Court summarily granted JLLA's Motion for Summary Judgment related to Karlen's claims for nonpayment of his 2011 bonus, nonpayment for commissions allegedly owed for basement space in the Primebar deal, nonpayment for commissions allegedly owed for revenue resulting from another deal (the H&M deal), and nonpayment related to his business expenses. However, the District Court also summarily denied JLLA's Motion related solely to Karlen's claims for commissions related to the first-floor space of the Primebar deal and sua sponte granted judgment in favor of Karlen with respect to these commission.

Specifically, the District Court held, the same day as the hearing, "that JLLA's conditional payments relating to the leasing revenue flowing from Primebar's lease of 6,457 square feet of first-floor space did not constitute payment of commissions Karlen earned. This nonpayment constitutes a violation of Minnesota Statutes § 181.03 and § 181.13, as well as breach of contract." [Appel. J136-37]. The District Court then calculated damages in accordance with the statutes.

The District Court erred in denying summary judgment on the first-floor Primebar commission because such commissions were not earned until *after* his termination and could not, then, constitute statutory violations. Consequently, the District Court's Order is incorrect for several reasons, all of which compel reversal.

12

**First**, statutory liability is only triggered for wrongful acts associated with "commission earned through the last date of employment" (Minn. Stat. § 181.03) or "commissions actually earned and unpaid at the time of discharge" (Minn. Stat. § 181.13). Here, Karlen did not earn the commission and payment was not received until *after* his termination.     **Second**, JLLA's commission structure stated that leasing specialists would be eligible for commissions related to revenue received.  Any such eligibility was not guaranteed and not determined at the time of Karlen's termination, as no deal had been executed. **Third**, it is undisputed that JLLA's practices determine when a commission is earned and paid, which, in this case, occurred after Karlen's termination from employment. Third, the agreement to pay Karlen the Primebar commission came after his employment ended. And, **fourth**, JLLA paid Karlen the Primebar commissions once they were earned (after his employment ended). This Court should reverse summary judgment and enter judgment for JLLA on Karlen's statutory and breach of contract claims associated with the Primebar commission payment.

**LEGAL ARGUMENT**

**I.     STANDARD AND SCOPE OF REVIEW.**

A district court's grant of summary judgment is reviewed *de novo*. *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011). Summary judgment is appropriate where there "is no genuine issue" of "material fact." Fed.

13

R. Civ. P. 56(c). A factual dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" only if its resolution might affect the outcome of the suit. *Id.*

Generally, appellate courts will not consider new arguments raised by a party for the first time on appeal. *Wiser v. Wayne Farms*, 411 F.3d 923, 926 (8th Cir. 2005). Thus, although a review of a grant of summary judgment is *de novo*, an appellate court limits its review to the arguments presented to the District Court.

Because the JLLA does meet its burden to demonstrate that Karlen's Primebar commission was not earned as of the last day of his employment as a matter of law, this Court should reverse the District Court's denial of summary judgment related to that claim and grant JLLA's Motion in its entirety.

## II. THE DISTRICT COURT ERRED IN HOLDING THAT JLLA VIOLATED MINN. STAT. § 181.03 AND §181.13 BECAUSE THE PRIMEBAR COMMISSIONS AT ISSUE WERE NOT "EARNED" AND "UNPAID" AT THE TIME OF KARLEN'S DISCHARGE.

Minn. Stat. § 181.03 and § 181.13 are very specific in defining the threshold requirement that commissions earned and unpaid prior to termination must be paid in accordance with the statutes. The statutes are silent as to commission earned and unpaid following termination. Specifically, these statutes provide:

> [A]n employer . . . may not alter the method of payment, timing of payment, or procedures for payment of commissions ***earned through the last day of employment***

14

> after the employee has resigned or been terminated if the
> result is to delay or reduce the amount of payment.

Minn. Stat. § 181.03.

> [T]he wages or commissions ***actually earned and unpaid***
> at the time of the discharge are immediately due and
> payable upon demand of the employee.

Minn. Stat. § 181.13.

These statutes are simply timing statutes. *See Lee v. Fresenius Medical Care, Inc.,* 741 N.W.2d 117, 125-28 (Minn. 2007) ("section 181.13(a) is a timing statute, mandating not *what* an employer must pay a discharged employee, but *when* an employer must pay a discharged employee."); [Appel. J196-216]. Nothing more. Thus, the timing of Karlen's termination (January 31, 2012) and the date the commissions became earned and unpaid is the critical (and only) determination that should be made.

Moreover, case law interpreting Minn. Stat. § 181.03 and § 181.13 instructs courts to defer to the parties' agreement concerning whether a certain category of pay, such as commissions, is "actually earned and unpaid." *See, e.g., Lee,* 741 N.W.2d at 125-28; *Holman v. CPT Corp.,* 457 N.W.2d 740, 743 (Minn. App. 1990), *review denied* (Sept. 20, 1990); *see generally Fiebelkorn v. IKON Office Solutions*, 668 F. Supp. 2d 1178, 1184 (D. Minn. 2009).

15

Thus, for his claims, the issue is whether Karlen's first-floor Primebar commissions were "earned and unpaid" ***before*** his termination from employment. The answer is an undeniable "no."

### A. *In accordance with the Comp Change Memo, Karlen did not earn commissions related to the Primebar deal prior to his termination from employment; thus, there is no statutory violation.*

First, Karlen was only "eligible for a production based incentive which includes commission payments of up to 30% of the leasing revenue you directly earn." [Appel. J65]. It is undisputed that no Primebar deal was signed at the time of Karlen's termination. There was no known commission earned and/or payable at the time of Karlen's termination from employment.[8] Karlen did not meet the condition precedent for payment.

The *Friedenfeld* case, as cited and argued by JLLA in its summary judgment motion, is instructive and analogous to the current case at bar. *See generally Friedenfeld v. Winthrop Resources Corp.*, No. C5-02-1606, C4-02-1659, 2003 WL 1908112 (Minn. Ct. App. Apr. 22, 2003); [Appel. J190-95]. The *Friedenfeld* case involved two salespersons that had commission agreements, were at-will employees, and who both resigned from employment prior to certain commissions related to the commission agreement being paid. The commission agreements did

---

[8] Because no Primebar deal had been executed, what would JLLA have paid Karlen if he demanded commissions the last day of his employment? Nothing, because there were no earned and unpaid commissions as of January 31, 2012.

16

not explicitly state that the salespersons must be employed to receive commission nor did they state when/how exactly the commissions were earned.

The *Friedenfeld* court found that because the plaintiffs were terminable at-will, they were not entitled to commissions received by the employer ***after*** the employment was terminated barring an explicit provision in the commission agreement requiring post-termination commissions to be paid and/or barring a practice requiring payment – neither of which existed. *Id*. at *2 (citing *Lapadat v. Clapp Thomseen Co.*, 397 N.W.2d 606, 609 (Minn. Ct. App. 1986)). Specifically, the court found that when a salesperson is no longer employed, he "leaves behind the income stream that continues to flow from that lease." *Id*. at *2.

Karlen was an at-will employee whom JLLA terminated for performance. The Comp Change Memo had no explicit provision requiring JLLA to pay Karlen post-termination commissions.[9] The Comp Change Memo stated that leasing specialists were only eligible to receive up to 30% commissions on revenue received. And, JLLA's practice (in accordance with the language in the Comp

---

[9] Judge Ericksen also held that JLLA breached its contract with Karlen. To establish breach of contract, a plaintiff must show formation of a contract, performance of any conditions precedent by plaintiff, a material breach by defendant, and damages. *See Hot Stuff Foods, LLC v. Dornbach*, 726 F. Supp. 2d 1038, 1042 (D. Minn. 2010). That holding is also in error because Karlen did not perform the condition precedent, *i.e.*, he did not directly earn the Primebar commission prior to his termination as argued herein. Consequently, JLLA did not materially breach the agreement.

17

Change Memo) clearly provided that commissions would be earned when JLLA received an executed lease and received payment.

Second, JLLA paid Karlen a thirty percent commission for the Primebar deal. It closed shortly after JLLA terminated his employment, and in accordance with its practice and industry standard (JLLA's subsequent agreement to pay Karlen for the Primebar deal), it paid him for the deal once the conditions precedent were met – *after* his employment ended. [Appel. J116-18, J167].

Consequently, under Minn. Stat. § 181.03 and § 181.13 there can be no violation because the Primebar deal was signed and the commissions were earned after Karlen's at-will employment was terminated.

### B. The commission generating event, as defined by JLLA's practices, occurred after his termination from employment; thus, there is no statutory violation.

Karlen admits he only "earned" commissions once JLLA received revenue. [Appel. J32]. Cross explained that Leasing Specialists would receive half of their thirty percent commission upon execution of the lease and after JLLA had received payment from the property owner. [Appel. J89-90, J96, J116-18]. Leasing Specialists would then receive the second half of their thirty percent commission upon tenant opening and after JLLA had received payment from the property owner. [*Id.*]. This practice, while not in the written Comp Change Memo, provides the basis for when the commission is earned and consequently, when JLLA has an

Appellate Case: 13-2379    Page: 25    Date Filed: 08/21/2013 Entry ID: 4067066

obligation to pay it to the Leasing Specialist. *See Friedenfeld*, 2003 WL 1908112, at \*2-4 (the commission generating event, while not clearly defined in writing, was defined by the practice of the employer and ultimately was relied on to determine if and when a commission was earned).

In examining the agreement in *Friedenfeld*, the court found that the commission generating event was the lease payment by the client because the commission agreement stated that the salesperson was entitled to the "gross margin generated by the sales" and the commission generating event was payment on the lease by the client. Thus, the salesperson earned his commission only when the company received the actual payment. *See Friedenfeld,* 2003 WL 1908112, at \*2-4. Similarly, in this case, the commission generating event was not clearly defined in the Comp Change Memo, but did state that such commissions were based on revenue received.[10] And it is JLLA's undisputed practice which determined when the commission generating event was. *Id.* at \*3. Thus, the commission was not earned unless received. Again, there can be no statutory violation under either Minn. Stat. § 181.03 or § 181.13.

---

[10] Judge Ericksen agreed that "those amounts are properly calculated based on the revenue actual received by Jones Lang LaSalle on that property." [Appel. J124].

Appellate Case: 13-2379    Page: 26    Date Filed: 08/21/2013 Entry ID: 4067066

### C. JLLA's subsequent agreement to pay the Primebar commissions negates any possibility of a statutory violation.

When Karlen's employment ended as a Leasing Specialist, so too did his eligibility to receive commissions under the Comp Change Memo (as argued above). *See generally Fiebelkorn v. Ikon Office Solutions, Inc.*, 668 F. Supp. 2d 1178, 1185 (D. Minn. 2009) (noting that nothing in the compensation plan indicated that the commission plan continued to apply after plaintiff's employment ended); [Appel. J173-89]. Subsequent to his termination from employment, Karlen spoke with JLLA regarding the Primebar deal and related commissions. And, JLLA agreed *after* Karlen's termination to pay him commissions on the Primebar deal once the monies were earned. To the extent that Karlen claims such money was not paid due to conditions or the post-termination practice and/or agreements, such a claim resounds in quasi-contract and is equitable in nature because it is based on a subsequent promise to pay. *See id.* at 1185 (employer's subsequent promise to pay commissions is separately enforceable under equitable theories).

Unfortunately for Karlen, he conceded his equitable claims, which were then dismissed by the District Court. Karlen also never argued that the subsequent agreement pursuant to industry practice created a separate and enforceable contract. [Appel. J6-15]. Yet again, there can be no statutory violation for a **subsequent** promise to pay.

20

## III. ANY ALLEGED "CONDITIONED" PAYMENTS ARE INCONSEQUENTIAL WHEN IT COMES TO DETERMINING WHETHER THERE WAS A STATUTORY VIOLATION.

Karlen argued that the payment of the Primebar commission checks were altered and therefore runs afoul of Minn. Stat. § 181.03 because JLLA "conditioned" such payments. This argument fails, however, for several reasons. **First**, and foremost, the commissions related to the Primebar deal were not earned until after Karlen's employment ended and any agreement to pay the commissions occurred subsequent to his employment, as argued above. Consequently, any alleged conditions are immaterial to whether a statutory violation existed.

**Second**, when JLLA paid Karlen for the Primebar deal, it issued three separate checks, which Karlen received at his residence unaccompanied by any explanation or letter from JLLA. [Appel. J112-13]. JLLA placed no conditions on the checks issued and in fact, Karlen could have immediately taken the checks to the bank and cashed them. It was upon his own attorney's inquiry of JLLA's counsel and her subsequent advice to Karlen that he chose not to cash the checks. JLLA's counsel simply responded to Karlen's attorney's inquiry about the checks stating that "the cashing of the checks only waives your client's entitlement to any more monies out of the commission payments made by the client to JLL". [Appel. J112-13, J122-23]. In other words, Karlen cannot double recover and is receiving his commission out of the payment JLLA received from the client. Moreover, this

21

exchange between counsel was purely JLLA's assertion of its defense related to Karlen's claims for the Primebar commissions that Karlen is not entitled to any more than what was agreed to between the parties– a defense which was originally asserted in its Answer and a defense which the law allows. [Appel. J26]; *see* Fed.R.Civ.P. 8(c); *Bechtold v. City of Rosemount*, 104 F.3d 1062, 1068 (8th Cir. 1997) (If a defendant fails to raise an affirmative defense, such defense is usually waived and excluded from the case).

**Third**, JLLA actually issued the first check earlier than it otherwise would have. As testified to by Cross, once Karlen involved an attorney, JLLA's legal department dealt with the issuance of the checks. Consequently, the first check was issued earlier than is practice – prior to JLLA receiving payment from the property owner. JLLA made this payment in an attempt to honor the post-termination agreement to pay Karlen for the Primebar deal. Karlen received the remaining checks in accordance with JLLA's practice. More evidence negating any inference that JLLA intended to "condition" the commission payments.

**Fourth**, Karlen claimed that JLLA terminated his employment when it did to interfere with (and/or delay or reduce the amount of payment) his ability to receive 2012 commissions for deals he brought to substantial completion. There is simply no evidence in the record to support that baseless allegation. In fact, the record provides that JLLA put Karlen on performance counseling in July 2011,

22

over six months before it terminated him. Additionally, JLLA paid Karlen for the Primebar deal, a deal that closed after his termination, thereby negating any inference of intentional interference. Finally, Karlen's counsel admitted during the summary judgment hearing that JLLA did not terminate Karlen so it would not have to pay him. [Appel. J125]. *See Buysee v. Pain, Webber, Jackson & Curtis, Inc.*, 623 F.2d 1244, 1249-50 (8th Cir. 1980) ("[w]ithout a finding of bad faith, an employee, employed under a contract terminable at will, may generally be discharged for any reason or no reason at all" and is not entitled to future compensation under that agreement).

Minn. Stat. 181.03 requires an intent to defraud – an intent that indisputably did not exist. *See* Minn. Stat. § 181.03, subd.1. And regardless of whether this Court determines the Primebar commissions were earned before or after Karlen's termination from employment, the alleged "conditions" on those payments do not violate Minn. Stat. § 181.03 and the District Court's holding that they did is in error.

## CONCLUSION

The District Court incorrectly held that JLLA violated Minn. Stat. § 181.03, § 181.13, and breached the contract. The plain language of the Comp Change Memo, JLLA's practices regarding commissions, Karlen's admissions concerning when a commission is earned, and the indisputable facts compel a reversal because

Appellate Case: 13-2379    Page: 30    Date Filed: 08/21/2013 Entry ID: 4067066

there were no commissions earned and unpaid at the time of Karlen's termination. In addition, there was no impermissible "condition" placed on the commission payments actually made to Karlen. This Court should reverse the District Court's denial of summary judgment related to the first-floor Primebar commissions and grant it for JLLA.

Dated:  August 19, 2013          Respectfully submitted,

**OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P. C.**

s/Jaime N. Cole
Hal A. Shillingstad, #195777
Jaime N. Cole, #0390677
Wells Fargo Center
90 South Seventh Street, Suite 3800
Minneapolis, MN  55402
Telephone:  612.339.1818
Fax:  612.339.0061
Email:
hal.shillingstad@ogletreedeakins.com
       jaime.cole@ogletreedeakins.com

***Attorneys for Defendant – Appellant***

Appellate Case: 13-2379    Page: 31    Date Filed: 08/21/2013 Entry ID: 4067066

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(1)(7)(C) and 8th Cir. L.R. 28A(C), the undersigned certifies that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7). The brief was prepared using Microsoft Office 2010, which reports that the brief contains 5,289 words. The brief was scanned for viruses and is free of viruses.

**OGLETREE, DEAKINS, NASH,
SMOAK & STEWART, P. C.**

Dated:  August 19, 2013

s/Jaime N. Cole
Hal A. Shillingstad, #195777
Jaime N. Cole, #0390677
Wells Fargo Center
90 South Seventh Street, Suite 3800
Minneapolis, MN  55402
Telephone:  612.339.1818
Fax:  612.339.0061
Email:
hal.shillingstad@ogletreedeakins.com
           jaime.cole@ogletreedeakins.com

*Attorneys for Defendant – Appellant*

25

## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2013, I electronically filed the foregoing with the Clerk of Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

**OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P. C.**

Dated:  August 19, 2013

s/Jaime N. Cole
Hal A. Shillingstad, #195777
Jaime N. Cole, #0390677
Wells Fargo Center
90 South Seventh Street, Suite 3800
Minneapolis, MN  55402
Telephone:  612.339.1818
Fax:  612.339.0061
Email:
hal.shillingstad@ogletreedeakins.com
        jaime.cole@ogletreedeakins.com

*Attorneys for Defendant – Appellant*

Appellate Case: 13-2379    Page: 33    Date Filed: 08/21/2013 Entry ID: 4067066

# INDEX TO ADDENDUM

| Document | Page |
|---|---|
| Order of the District Court | 1 |
| Judgment of the District Court | 3 |

Appellate Case: 13-2379    Page: 34    Date Filed: 08/21/2013 Entry ID: 4067066